ROBERT C. STILLWELL (Cal. Bar No. 308630)
Email: stillwellr@sec.gov
GARY Y. LEUNG (Cal. Bar No. 302928)
Email: leungg@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Gary Y. Leung, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> EL CAPITAN ADVISORS, INC. and ANDREW NASH, <br><br> Defendants. | Case No. 2:25-cv-05066 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 80b-14].

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Andrew Daniel Nash resides in this district, and Defendant El Capitan Advisors, Inc. has its principal place of business in this district.

### SUMMARY

4.     Defendant El Capitan Advisors, Inc. ("ECA") is an SEC-registered investment adviser, and Defendant Andrew Daniel Nash (collectively, "Defendants") is ECA's majority owner.  This civil enforcement action concerns Defendants' fraudulent misappropriation of $15.3 million in advisory client funds.  In June 2021, ECA entered into an agreement with a public company ("Client A") to provide cash management services.  ECA led Client A to believe that its money, which totaled tens of millions of dollars, was being held in accounts for the benefit of Client A at various financial institutions.  In reality, between June 2022 and March 2023, Nash transferred over $15 million out of Client A's accounts and spent a large portion of that money on himself, using $4.6 million of Client A's money to purchase a home. All of this was in breach of the fiduciary duty that ECA and Nash owed to Client A as investment advisers.

5.     Nash took extensive efforts to conceal his misappropriation.  Beginning in July 2022, Nash prepared and sent to Client A fabricated monthly account statements that concealed Defendants' unauthorized transfers.  For example, in March 2023, Nash recommended that Client A authorize Defendants to open new accounts for the benefit of Client A at two financial institutions and invest $8 million in a well-known federal money market fund.  After Client A authorized the transfers, Nash sent Client A account statements that purportedly confirmed the authorized transactions had taken place.  However, each of the statements was a fabrication.  Defendants never opened new accounts for Client A.  Instead, Nash made a $1 million transfer at

the end of March 2023 that Client A had not authorized.  In all, between June 2022 and March 2023, Defendants misappropriated a total of $15.3 million of Client A's funds (inclusive of the $4.6 million that Nash used to purchase a home).

6.      Defendants also made false statements in the Forms ADV that ECA filed with the SEC in 2022 and 2023.  Nash signed these false filings on behalf of ECA knowing they were inaccurate.  For example, in the Form ADV that ECA filed in 2022, ECA reported that it had over $3.6 billion in regulatory assets under management ("AUM") as of March 7, 2022.  Then, in 2023, ECA reported that it had over $7.4 billion in AUM as of December 31, 2022.  Both these statements about ECA's AUM were materially false and misleading.  ECA managed client accounts at a single financial institution.  According to financial records, as of March 7, 2022, the total value of the assets held in those accounts was less than $62 million, approximately 1.7% of ECA's claimed AUM; as of December 31, 2022, the total was less than $85 million, approximately 1.1% of ECA's claimed AUM.

7.      By engaging in this conduct, Defendants violated Sections 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2), & § 80b-7].  With this Complaint, the SEC seeks permanent injunctive relief and disgorgement with prejudgment interest against both Defendants, and civil penalties against Nash.

## DEFENDANTS

8.      El Capitan Advisors, Inc. is a Delaware corporation with its principal place of business in Santa Barabara, California.  ECA was formed in June 2018 and has been registered with the Commission since June 2, 2021.

9.      Andrew Daniel Nash, age 48, is a resident of Santa Barbara, California.  Nash is the CEO and majority owner of ECA.  From at least 2021 until 2023, Nash worked as an investment adviser representative for ECA, provided investment advice to certain ECA clients, and was compensated for his services.  Nash holds a Series 65 license.

**RELEVANT ENTITY**

10.    "Client A" is a Nevada-based public company engaged in a cannabis-related industry.

**THE ALLEGATIONS**

**A.    ECA's Business**

11.    From at least 2021 until 2023, Defendants provided ECA clients with investment management and cash management services.  ECA clients could elect to receive either or both services.

12.    During this time period, Defendants were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because they held themselves out as being engaged in the business of providing, for compensation, investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

13.    Nash, on behalf of ECA, provided investment management services, advising ECA clients as to the advisability of investing in exchange-traded funds, mutual funds, bonds, and other investment options.  For these services, ECA generally charged an annual fee of 1% of a client's assets under management.

14.    Defendants also provided cash management services to clients that faced difficulties establishing direct relationships with financial institutions due to, for example, a client's ties to the cannabis industry.

15.    For cash-management clients, Defendants generally opened and maintained a savings or money market account that ECA held in its own name "for the benefit of" (or "FBO") the client.  Under the terms of ECA's cash-management agreements, ECA was authorized to effect transactions on behalf of the client in accordance with the client's stated goals and objectives.  For these services, ECA generally charged a monthly fee of $250, plus a percentage of any gains realized in the account.

16.    As investment advisers, Defendants owed their clients both a fiduciary

duty of care and a fiduciary duty of loyalty.  Those fiduciary duties obligated Defendants to serve, at all times, the best interests of their clients and not subordinate those clients' interests to their own.

### B.    Client A Engages ECA

17.    On June 22, 2021, Client A entered into an agreement with ECA pursuant to which ECA would provide cash management services to Client A.  In the agreement, ECA represented that it was registered with the SEC as an "Investment Adviser" and committed to performing cash management services as a fiduciary of Client A.

18.    Client A authorized ECA to effect transactions on its behalf in accordance with Client A's stated goals and objectives.

19.    For these services, ECA charged Client A what it described as a monthly "investment management fee" of $250 plus a percentage of the interest generated in any account that ECA held for the benefit of Client A.

20.    At the time that Client A engaged ECA, Client A relied upon ECA's status as a registered investment adviser and its obligations as a fiduciary of Client A to manage Client A's funds in the best interest of Client A.  Client A understood that ECA would not execute any transaction on behalf of Client A without Client A's prior authorization.

21.    On June 29, 2021, ECA opened a money market account for the benefit of Client A at a bank ("Financial Institution #1") where ECA held numerous accounts, including multiple FBO accounts.  ECA opened a second money market account for Client A at Financial Institution #1 in October 2021.  Transfers from these two accounts could only be made by ECA.

22.    Between June 2021 and September 2023, Client A deposited tens of millions of dollars into the accounts that ECA opened for its benefit at Financial Institution #1 and entrusted ECA with those funds.

23.    In the ordinary course of business, whenever Client A wished to make a

capital expenditure, ECA required, and Client A would provide, express authorization instructing ECA to execute a transfer on Client A's behalf.

24.    Whenever Client A would instruct ECA to transfer funds to an outside recipient, Defendants would not transfer the funds directly from ECA's account at Financial Institution #1, but would funnel those transfers through a "funding account" held by ECA at Financial Institution #1 (the "ECA Funding Account"), which Defendants used to receive and transfer funds held in ECA cash-management clients' accounts.

25.    Hundreds of millions of dollars passed through the ECA Funding Account between 2021 and 2023.

26.    Because, as alleged more fully *infra*, Defendants provided investment advice as to the value of securities and as to the advisability of investing in securities to Client A, and compensated themselves through their repeated misappropriation of Client A's funds, Defendants were Client A's investment adviser within the meaning of Section 202(a)(11) of the Advisers Act.

### C.    Nash Misappropriates $4.6 Million from Client A to Purchase a Home

27.    On June 15, 2022, Nash recommended that Client A authorize a transfer of $5 million from one of Client A's money market accounts at Financial Institution #1 to the other.  Nash claimed that Client A's funds would earn a higher rate of return in the latter account and Client A authorized the transfer.

28.    Defendants did not execute the transfer authorized by Client A.

29.    Instead, on June 27, 2022, Nash transferred $4.6 million from Client A's account to the ECA Funding Account and, that same day, sent a wire transfer of $4.6 million from the ECA Funding Account to a title company that was facilitating Nash's purchase of a Santa Barbara home.

30.    Client A did not authorize the June 27, 2022 transfer.

31.    On June 29, 2022, Nash transferred an additional $400,000 from Client

A's account to the ECA Funding Account.

32.    Client A did not authorize the June 29, 2022 transfer.

**D.    Defendants Send Fabricated Account Statements to Client A and Make Further Unauthorized Transfers from Client A's Account**

33.    Beginning in July 2022, Nash prepared and sent to Client A fabricated monthly account statements that effectively concealed Nash's fraudulent misappropriation of Client A's funds.

34.    On July 18, 2022, Nash sent Client A an email that purported to attach the June 2022 account statement for each of Client A's two money market accounts at Financial Institution #1.

35.    Each of the two statements reflected a purported transfer, on June 27, 2022, of $5 million from Client A's first money market account to the second, ostensibly confirming that ECA had executed the transfer in accordance with the authorization that Client A had provided to Nash.

36.    The fabricated statements that Nash sent to Client A on July 18, 2022, were materially false and misleading because they effectively concealed Nash's misappropriation of funds from Client A's account in June 2022.

37.    According to the statements that Nash sent to Client A, as of June 30, 2022, ECA held a total of approximately $27 million for the benefit of Client A in its two money market accounts at Financial Institution #1.  In reality, at the time, the two accounts held a total of approximately $22 million.

38.    In the months that followed, Defendants made further unauthorized transfers from Client A's accounts at Financial Institution #1.

39.    For example, on February 1, 2023, Nash *closed* Client A's second money market account at Financial Institution #1, sending the account's balance of approximately $5 million to the ECA Funding Account.

40.    Nash did not seek Client A's authorization for the transaction, nor did Nash even inform Client A of the account's closure.

41.     To the contrary, in March 2023, Nash prepared and sent a fabricated statement to Client A that falsely stated that the account was open and still held over $10 million as of February 28, 2023.

42.     In all, between October 2022 and March 2023, Defendants made a total of $10.7 million in additional unauthorized transfers from Client A's money market accounts to the ECA Funding Account at Financial Institution #1.

43.     These funds were subsequently commingled with other funds from ECA's business and gradually dissipated, as Defendants executed transfers on behalf of other ECA cash-management clients using funds from the ECA Funding Account.

44.     Each month, until November 2023, Nash concealed all of this from Client A by preparing and sending to Client A materially false and misleading account statements that omitted these unauthorized transfers from Client A's accounts.

45.     Because Client A had no direct dealings with Financial Institution #1, Nash's fabricated account statements effectively prevented Client A from discovering Defendants' misappropriation of Client A's funds.

## E.     Nash Recommends That Client A Purchase Securities to Further Enable and Conceal Defendants' Misappropriation of Client A's Funds

46.     In March 2023, Client A told Nash that it wished to diversify the financial institutions that were holding its funds.

47.     At the time, based on fabricated February 2023 account statements that Client A had received from Nash, Client A understood that it held a total of approximately $26.5 million in two accounts at Financial Institution #1.  In reality, following Defendants' unauthorized transfers, Client A's sole remaining account held less than $11.8 million as of February 28, 2023.

48.     Nash did not disclose the unauthorized transfers to Client A when it said it wished to diversify its holdings.  Instead, in response to Client A's request, Nash

recommended that Client A invest $8 million in a money market account at Financial Institution #2.

49.    Separately, Nash recommended that Client A invest $8 million in a particular security through Financial Institution #3.  Specifically, Nash recommended that Client A invest in a well-known federal money market fund, which Nash identified by name and ticker symbol.

50.    On March 23, 2023, Client A authorized Nash to go forward with both investments.

51.    On April 10, 2023, Nash sent fabricated March 2023 account statements to Client A.  The statements falsely made it appear that, on March 23, 2023, ECA had transferred a total of $16 million out of Client A's two accounts at Financial Institution #1 – notwithstanding that one of the accounts had been closed weeks earlier – to "new" accounts that ECA had opened for the benefit of Client A at Financial Institutions #2 and #3.

52.    The purported March 2023 statement from Financial Institution #2 corroborated the false appearance, falsely showing that ECA had opened a money market account and invested $8 million for Client A on March 23, 2023.

53.    Likewise, the purported March 2023 statement from Financial Institution #3 falsely made it appear that, on March 23, 2023, ECA had opened an account and invested $8 million on Client A's behalf in the federal money market fund that Nash had specified in his recommendation to Client A.

54.    All of these false account statements were material because they falsely represented that ECA had executed the transactions that Client A had authorized on March 23, 2023 when, in fact, ECA had not.

55.    ECA never opened an account for the benefit of Client A at either Financial Institution #2 or Financial Institution #3.

56.    On March 31, 2023, rather than invest Client A's funds in accordance with Nash's recommendation, Defendants made a final unauthorized transfer of $1

million from Client A's account at Financial Institution #1 to the ECA Funding Account.

57.    After purportedly opening these two new accounts for Client A in March 2023, Nash continued to prepare and send to Client A fabricated monthly account statements from Financial Institutions #1, #2, and #3.

58.    Nash fabricated these account statements to conceal and prevent Client A from discovering Defendants' misappropriation of $15.3 million of Client A's funds (inclusive of the $4.6 million that Nash misappropriated to purchase a home).

**F.    Defendants' Fraud Is Revealed**

59.    On May 16, 2023, an ECA minority shareholder commenced a private action against ECA in California state court.  The shareholder alleged that, in April 2023, the shareholder and ECA had entered into an agreement pursuant to which ECA would repurchase the shareholder's ECA shares for approximately $35 million. According to the shareholder, ECA had been required, but had failed, to make requisite payments under the agreement.

60.    ECA did not answer or file any other response to the shareholder's complaint.

61.    On July 26, 2023, the state court entered a default judgment against ECA in the amount of $35 million.

62.    In August 2023, Financial Institution #1 was served with a levy and writ of execution of the state court's judgment.  In September 2023, Financial Institution #1 turned over the balances of accounts held by ECA, including Client A's FBO account, to the Orange County Sheriff's Department.

63.    On or about October 24, 2023, Nash informed Client A, for the first time, that a levy had been placed on Client A's account at Financial Institution #1 by the Orange County Sheriff's Department.

64.    At Nash's request, Client A completed a third-party claim form confirming its ownership of the funds in Client A's FBO account at Financial

Institution #1.

65.     Client A asked Nash to consolidate all of its funds in the account that
ECA purportedly held for Client A at Financial Institution #3.  Nash led Client A to
believe that he had executed the consolidation, notwithstanding the levy.

66.     On November 2, 2023, Client A asked Nash to transfer $20 million –
nearly all of the funds that ECA purportedly managed for Client A – from Financial
Institution #3 to a non-ECA bank account held by Client A.

67.     Nash falsely told Client A that he had executed the transfer, but he had
not, and the funds never appeared in Client A's account.

68.     On November 13, 2023, Nash sent a fabricated October 2023 account
statement for Financial Institution #3 to Client A.  The statement falsely stated that,
on October 24, 2023, Nash had closed Client A's accounts at Financial Institutions #1
and #2 and transferred the funds to Financial Institution #3, in accordance with Client
A's instruction.  According to the fabricated account statement, following the
purported transfers, ECA had invested approximately $21.3 million on Client A's
behalf in the federal money market fund.

69.     On November 14, 2023, Nash followed this up with fabricated
statements from Financial Institutions #1 and #2, falsely indicating the transactions
had happened.  In particular, the fabricated account statement from Financial
Institution #1 falsely reflected that on October 24, 2023, ECA had transferred
approximately $4.8 million from the account it held for Client A at Financial
Institution #1 to the account at Financial Institution #3.

70.     The actual, historical monthly account statements generated by Financial
Institution #1 demonstrate that the account statements Nash sent to Client A were
false and reveal the scope of Defendants' fraud.  They show that Defendants
misappropriated $15.3 million from Client A's accounts between June 2022 and
March 2023.

**G.    Defendants Acted with Scienter and Negligently in Carrying Out the Scheme**

71.    ECA and Nash, whose conduct and mental state are imputed to ECA, both acted with scienter in carrying out the scheme and in violating their fiduciary duties to Client A, and failed to exercise the standard of care reasonably expected of investment advisers in carrying out their fiduciary duties to Client A, including the duty of loyalty and duty of care.

72.    The scienter and negligence of ECA and Nash are demonstrated, in part, by the following:

(a)    Nash transferred $15.3 million out of Client A's accounts without authorization, including $4.6 million that Nash used to purchase a home.

(b)    Nash recommended that Client A open accounts at two financial institutions and sent fabricated account statements for those accounts, even though Defendants never opened an account for Client A at either institution.

(c)    Nash prepared and sent numerous other fabricated account statements that omitted Defendants' unauthorized transfers and concealed Defendants' misappropriation of $15.3 million of Client A's funds.

**H.    Defendants Grossly Overstate ECA's Assets Under Management in a Report Filed with the SEC**

73.    A Form ADV is filed with the SEC by SEC-registered investment advisers.  The Form ADV consists of two parts, both of which are publicly available to clients and prospective clients once they are filed with the SEC.

74.    Form ADV Part 1 requires the investment adviser to disclose, among other things, the amount of the adviser's regulatory assets under management ("AUM"), and to identify any custodian that holds ten percent or more of the firm's AUM.  Form ADV Part 2 is a brochure that presents, in narrative form, key information about the firm.  An investment adviser's Form ADV must be updated annually and made available to firm clients.

75.   In March 2022 and March 2023, ECA filed annual amendments to its Forms ADV Part 1 and Part 2.

76.   As the CEO and majority owner of ECA, Nash signed each of ECA's Forms ADV Part 1, certifying that the information presented therein was true and correct "under penalty of perjury under the laws of the United States of America." Nash knew, or was reckless for not knowing, that he was responsible for the accuracy of the information presented in each Form ADV Part 1.

77.   In each of the ECA Forms ADV Part 1 referenced above, ECA identified two custodians that held ten percent or more of the firm's AUM: Financial Institution #1 and Financial Institution #3.

78.   However, as of the date relevant to each Form ADV, Financial Institution #3 did not hold *any* assets managed by ECA.

79.   In fact, there is no evidence that, as of the date relevant to each Form ADV, ECA managed client accounts at *any* financial institution other than Financial Institution #1.

80.   According to the Form ADV Parts 1 and 2 that ECA filed with the SEC in March 2022, ECA claimed to have $3,602,000,000 in AUM as of March 7, 2022.

81.   This statement was materially false because, as of March 7, 2022, ECA managed 92 accounts at Financial Institution #1 and the total value of those assets was less than $62 million, approximately 1.7% of ECA's claimed AUM.

82.   According to the Form ADV Parts 1 and 2 that ECA filed with the SEC in March 2023, ECA claimed to have $7,425,381,304 in AUM as of December 31, 2022.

83.   This statement was materially false because, as of December 31, 2022, ECA managed 101 accounts at Financial Institution #1 and the total value of those assets was less than $85 million, approximately 1.1% of ECA's claimed AUM.

84.   ECA and Nash, whose conduct and mental state are imputed to ECA, acted both willfully and recklessly when they falsely reported in the Forms ADV

filed with the SEC that ECA had over $3.6 billion in AUM as of March 7, 2022, and over $7.4 billion in AUM as of December 31, 2022.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (Against all Defendants)

85.    The SEC realleges and incorporates by reference paragraphs 1 through 84 above.

86.    At all relevant times, Defendants were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)].  Nash and ECA were each in the business of providing investment advice concerning securities for compensation.

87.    By engaging in the conduct described above, Defendants, by use of the mails or means and instrumentalities of interstate commerce, directly or indirectly, knowingly or recklessly: (i) employed or are employing devices, schemes, or artifices to defraud clients and/or potential clients; and (ii) engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

88.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2)].

## SECOND CLAIM FOR RELIEF

### Violation of Sections 207 of the Advisers Act

### (Against all Defendants)

89.    The SEC realleges and incorporates by reference paragraphs 1 through 84 above.

90.    In the Forms ADV that ECA filed with the SEC pursuant to Section 204 of the Advisers Act [15 U.S.C. § 80b-4] in March 2022 and March 2023, Defendants willfully made untrue statements of a material fact.

91.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206(1), 206(2), and 207 of the Advisers Act [15 U.S.C. §§80b-6(1), 80b-6(2), & 80b-7].

### III.

Order Defendants to disgorge all funds received as a result of their alleged violations, with prejudgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 78u(d)(5) & 78u(d)(7)].

### IV.

Order Nash to pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38 and L.R. 38-1, the SEC demands a trial by jury on all issues so triable.

Dated:  June 4, 2025

*/s/ Robert C. Stillwell*
_____
Robert C. Stillwell
Gary Y. Leung
Attorney for Plaintiff
Securities and Exchange Commission

COMPLAINT

16